UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NATIONAL CITY BANK, N.A. and
THE PNC FINANCIAL SERVICES
GROUP, INC.,

              Plaintiffs,

  vs.

PRIME LENDING, INC.; RONALD
D. THOMAS and JOHN DOES 1-20,

             Defendants.

NO. CV-10-34-EFS

**ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

An evidentiary hearing occurred in the above-captioned matter on April 27 and 28, 2010, in Richland, Washington. Christopher P. Fisher, Isaac J. Eddington, Joseph A. Castrodale, and Thomas Cochran appeared for Plaintiffs National City Bank, N.A. ("National City") and The PNC Financial Services Group, Inc. ("PNC"); Karen F. Jones and James E. Breitenbucher appeared for Defendant Prime Lending, Inc. ("Prime"); and Patrick Kirby and Erik H. Thorleifson appeared for Defendant Ronald D. Thomas ("Thomas"). Before the Court was Plaintiffs' Motion for Preliminary Injunction (Ct. Rec. 50), in which they seek to prevent Defendants from recruiting current or former National City employees, serving former National City customers, and disclosing or using National City's trade secrets. The Court heard testimony from John Schleck and

ORDER ~ 1

considered the declarations submitted by counsel (Ct. Recs. 52, 54, 55, 92, 93, 95, 96, 97, 98, 99, 114, 115, 130, 131, & 132). Because Plaintiffs did not meet their burden of showing entitlement to a preliminary injunction, the Court denies Plaintiffs' motion.

## I. Background[1]

National City was a nation-wide bank based in Cleveland that provided home mortgage loans. Thomas was National City's Spokane branch manager. He earned a small salary for supervising the loan officers, but most of his compensation came from commissions on loans he himself originated.

In December 2007, in return for his good work and loyalty, National City offered Thomas restricted stock, subject to a Restricted Stock Agreement ("RSA") that Thomas signed. Significantly, the RSA prevented Thomas from soliciting National City customers for one year after leaving National City's employment, disclosing or using any National City trade secret, and recruiting any National City employee for three years after leaving National City's employment. (Ct. Rec. 52 Ex. 3.) Additionally, in his February 2007 Bank Manager Compensation Agreement ("BMCA"), he agreed not to disclose National City's confidential information and not to solicit any National City employee for six months after leaving National City. (*Id*. Ex. 4 at 4-5.) Moreover, he agreed in the BMCA that use of confidential information could result in irreparable harm and could be enjoined.

_____

[1] The following background is based on the testimony of John Schleck and the above-noted declarations.

ORDER ~ 2

National City's loan origination software was called Byte. Loan officers used Byte to store useful solicitation information about current and potential customers, some of which was publicly available and some of which was developed through years of customer interactions. For example, a customer's Byte file might include how the customer preferred to be contacted, the customer's birthday, and the age of the customer's car, all of which is confidential information. When Thomas joined National City, he uploaded all his customer information onto Byte. Customer information always flowed from the loan officers to National City, never the other way around.

In December 2008, PNC used Troubled Asset Relief Program funds to merge with National City. PNC was the surviving company and it decided to eliminate the National City brand. The merger also brought significant changes to PNC's mortgage loan origination policies. PNC centralized operations so that only two locations underwrote and packaged loans, whereas processors performed those tasks in all National City offices before. This move eliminated many loan processing jobs in field offices, including Spokane.

PNC also standardized compensation and employee functions across all offices. Most significant were the changes to internal refinance commissions and branch manager duties. Internal refinances, or refinances on loans originated with National City or PNC, were capped at thirty-five basis points, about half the previous commission. Loans subject to PNC's churn policy, or those that were refinanced shortly after the initial closing, were exempted from this cap. Branch managers were also newly prohibited from producing loans. PNC wanted its branch managers to spend

their time recruiting and training loan officers rather than originating loans.

These changes caused concern in National City's branches. Loan officers worried that eliminating loan processors in the field offices would cause inefficiencies and slow down production. In turn, sluggish loan processing would drive away customers. All employees worried about their income. In 2009, most mortgage business came from refinancing, not from original purchase loans. Low interest rates and an economic slump encouraged that pattern. Many loan officers worked primarily on internal refinances, and with the changes after the merger, their commissions stood to be reduced by half. Branch managers such as Thomas were particularly worried because most of their income came from loan origination commissions. The new compensation plan completely eliminated that income source for them. Although branch managers still had an incentive to help loan officers because their compensation was based partly on the branch's total loan production, over half of their income would disappear with the new changes.

Thomas shared his concerns with PNC's CEO, Saiyid Naqvi, when Naqvi met with branch managers in Seattle on April 22 and 23, 2009. (Ct. Rec. 93 at 13.) Naqvi responded that everything would be all right, and loan officers who disagreed with the changes could leave. *Id.* at 14.

Naqvi spoke half-presciently. Everything was not all right for PNC, but many loan officers left. After implementing the changes, 80% of PNC's workforce in the western United States resigned. (Ct. Rec. 95 Ex. 1 at 25.) The Spokane branch was decimated in that mass resignation.

The first employee to leave the Spokane office was a loan officer named Greg Templeton, who was dissatisfied with the changes to the compensation schedule. During the spring of 2009, Templeton began talking with Prime. He first learned of Prime when he contacted a former colleague named Jillian Tuattoo, who worked in Prime's Puyallup office. (Ct. Rec. 98 at 4.) After Prime hired Templeton, it became interested in acquiring National City's entire Spokane branch and began recruiting Thomas. In May 2009, Thomas and several of his loan officers flew to Prime's corporate headquarters in Dallas for a recruiting meeting. (Ct. Rec. 97 at 4.) Either then or soon after, Prime hired Thomas to run its Spokane branch.

Thomas remained a National City employee for several weeks after accepting a job with Prime. During that time he effectively began working for Prime although still employed by PNC.[2] For example, Thomas sent contact information for several National City employees to Kale Salmans, Prime's Vice President, so that Salmans could recruit them.[3] (Ct. Rec. 53 Ex. 3.) Thomas also sent Salmans a pro forma, or a business estimate for the Spokane branch, which included some confidential information about National City's business strategy. (Ct. Rec. 115 Ex. 8 at 91.)

---

[2] Prime asked Thomas to perform tasks while still employed at PNC multiple times, and Thomas demurred because of improper appearance only once, when Prime asked him to give his subordinates Prime's employment agreement forms. (Ct. Rec. 130 Ex. 1 at 74.)

[3] That information was publicly available on National City's website. (Ct. Rec. 93 at 19.)

ORDER ~ 5

Nor was Thomas the only one to disclose confidential National City information to Prime. Other employees sent Prime their mortgage pipelines, which detailed their pending loans, in order to show that they were active officers. *Id.* at 84–86. Salmans repeatedly instructed the incoming employees not to bring with them any information that was not publicly available, however. (Ct. Rec. 97 at 6; *id.* Ex. A.)

On July 14, 2009, ten of National City's Spokane loan officers resigned and left for Prime. The only remaining employees in the office were Thomas and his brother Chad. Thomas feigned surprise and ignorance at the defection. He said he had no idea where the loan officers went but that he wanted to remain at National City to try to rebuild the branch.

While Thomas stayed with National City for a few more weeks, he continued to work for Prime. He told John Schleck, PNC's divisional manager and his direct superior, that he worried about the cost of the lease of PNC's Spokane office. He encouraged Schleck to consolidate the office into the Spokane Valley office, even though six months remained on the lease. Schleck did not know at the time that the landlord for the Spokane office was a limited liability company owned in part by Thomas. Thomas arranged to install Prime's telephone equipment and data lines in the office on a mid-July day specifically chosen because Schleck would not be in the office. Prime also asked Thomas to help Prime's new employees input their hours into Prime's payroll during this period. (Ct. Rec. 53 Ex. 8.) Additionally, Thomas let Prime know that a former National City employee named Lorrie Tracy was frustrated because she was not yet on Prime's system and had been holding onto loans to upload to Prime's database for weeks. In the weeks after the loan officers left and

before he resigned, Thomas forwarded several loan inquiries to his personal e-mail address, presumably so that he could follow up on them after he began formally working for Prime.

Thomas ended his charade on August 6, 2009, when he resigned to join Prime. When Thomas officially began working at Prime, there were already 120 loans in Prime's Spokane branch pipeline. According to Schleck, it would be extremely difficult to start out with so many loans in the first month without prior customer contact. However, Plaintiffs presented no direct evidence that Thomas or any other former National City employee actually took any uncompleted loans when leaving PNC or used confidential information to solicit customers. Nor did Plaintiffs identify any customers they lost to Prime.

Upon Plaintiffs' request, the former employees returned their Byte files to PNC. Those employees did not confirm that they did not keep any copies for themselves, however.

After PNC's Spokane office closed, it abandoned the region temporarily. It has no present plans to reopen and has no pending hires in Eastern Washington and Idaho. PNC intends to focus on rebuilding in Western Washington. It still is able to serve customers in the region through its Consumer Direct division, which produces loans over the phone and on the internet. Recently, PNC's branch in Oak Harbor, Washington switched over to Prime, but PNC does not suspect Thomas recruited anyone in that office for Prime.

## II. Standard

"A preliminary injunction is not a preliminary adjudication on the merits: it is an equitable device for preserving the status quo and

ORDER ~ 7

preventing the irreparable loss of rights before judgment." *Textile Unlimited v. A..bmhand Co.*, 240 F.3d 781, 786 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

### III. Discussion

The Court finds that Plaintiffs met their burden of showing they are likely to succeed on the merits of some of their claims but not others. They did not demonstrate that they are likely to suffer irreparable harm or that the balance of the equities or the public interest favors an injunction.

**A.   Likelihood of Success on the Merits**

**1.   Breach of Contract**

The RSA that Thomas signed prohibited him from soliciting National City customers for one year and from recruiting National City employees for three years after leaving employment with National City, as well as from taking National City's confidential information. Plaintiffs argue that Thomas breached those non-compete covenants by helping Prime recruit National City employees in his region while still employed with National City, by attempting to lure National City customers once he began working at Prime, and by taking National City's confidential information. Defendants counter that Thomas signed the non-compete covenants with

National City, not with PNC, and those covenants were not assignable under Ohio law.

Preliminarily, the Court must determine which state's law to apply to this issue. Defendants assert that, because the parties agree that Ohio law governs the RSA, Ohio law dictates whether the contract was assignable. Plaintiffs argue that Pennsylvania and Delaware law applied to the merger between PNC and National City, so those states' law governs the assignability of the companies' contracts. The Court agrees with Defendants that Ohio law applies because the parties reasonably chose Ohio law to govern the RSA. When there is a change in corporate ownership, assignment of a non-compete covenant must be legal under the law that governs each individual contract, regardless of which state's law applies to the merger. *See Fitness Experience, Inc. v. TFC Fitness Equip., Inc.*, 355 F. Supp. 2d 877, 887 (N.D. Ohio 2004) (noting that an asset transfer from one corporation to another involves assignment of a non-compete covenant whose validity depends on Ohio law; *Rogers v. Runfola & Assocs., Inc.*, 565 N.E.2d 540, 543 (Ohio 1991) (holding that a non-compete must be assignable in order for it to remain valid after a change in ownership from a sole proprietorship to a corporation).

Under Ohio law, a non-compete covenant may be assignable even if the contract does not specify as much. *Blakeman's Valley Office Equip., Inc. v. Bierdeman*, 786 N.E.2d 914, 917 (Ohio App. 2003). Conversely, even a contract that explicitly says it is assignable may not be. *See Murray v. Accounting Ctr. & Tax Servs., Inc.*, 898 N.E.2d 89 (Ohio App. 2008) (scrutinizing whether a non-compete covenant with an explicit assignment clause was assignable). Whether it is assignable depends on three things:

1) whether the contract's language indicates that the parties intended for the non-compete covenant to be assignable; 2) whether assignment is necessary to protect the employer's goodwill; and 3) whether assignment would create additional burdens on the employee because of the change in ownership. *Fitness Experience*, 355 F. Supp. 2d at 889; *Rogers*, 565 N.E.2d at 543; *Blakeman's Valley*, 786 N.E.2d at 918; *Rock of Ages Mem'l, Inc. v. Braido*, No. 00 BA 50, 2002 WL 234666 (Ohio App. Feb. 8, 2002). Additionally, Ohio courts view non-compete clauses skeptically and construe them against the party seeking enforcement. *Fitness Experience*, 355 F. Supp. 2d at 888-89; *Lake Land Employment Group of Akron, LLC v. Columber*, 804 N.E.2d 27, 30 (Ohio 2004).

The contract's language does not strongly indicate that the parties intended the non-compete covenant to be assignable. The only clause in the entire RSA that mentions the effects of a merger is paragraph 2, which reads "Any additional shares of equity securities which the Grantee may become entitled to receive by virtue of . . . a merger . . . shall be subject to the restrictions set forth herein." (Ct. Rec. 52, Ex. 3 at 1.) This does not convince the Court that the parties intended the non-compete covenant to be assigned to the new employer in the event of a merger. It could just as plausibly mean that additional stock issued in any merger would be subject to the RSA only if National City remained the employer. The contract's ambiguity with respect to assignment is especially marked when the RSA is compared to other contracts whose non-compete covenants were held to be assignable. *See Murray*, 898 N.E.2d at 98 (holding that a non-compete clause was assignable to a new employer

ORDER ~ 10

in part because the contract explicitly specified that the non-compete clause was assignable).

Nor is assignment of the non-compete clause necessary to protect Plaintiffs' goodwill. Whether a non-compete agreement is necessary to protect an employer's goodwill depends on whether the business "perform[s] unique services and is highly dependent on a few key clients," or "sell[s] malleable goods at several fixed locations to the general public." *Fitness Experience*, 355 F. Supp. 2d at 890. Though Thomas was a high-level employee at National City, Plaintiffs lend mortgages, a fungible service. Additionally, since Plaintiffs suffered their injuries, PNC closed its doors in Spokane and discarded the National City brand. There is no longer any goodwill in this region for Plaintiffs to protect, so the non-compete covenant is not necessary. Finally, the Court notes that it is common in the mortgage industry for departing officers to take their books of business to their new employers when they leave. (Ct. Rec. 93 at 4; Ct. Rec. 96 at 2; Ct. Rec. 98 at 4-5). Indeed, client relationships are what make a loan officer attractive to a new employer. (Ct. Rec. 93 at 7-8.) Because officers commonly compete with their former employers using their client contacts, it is not necessary for the Court to prevent an officer from using his client relationships in this case in order to protect lenders' goodwill. This factor disfavors finding that the non-compete covenant is assignable.

The last factor, hardship on Thomas, also disfavors assignability. PNC's takeover of National City dramatically changed Thomas's job duties and income. The majority of Thomas's income came from mortgage

commissions, but PNC prohibited him and all other branch managers from producing loans. This change eliminated most of his compensation and created a substantial burden on Thomas that counsels against assignability of the non-compete covenant. *Cf. Murray*, 898 N.E.2d at 91, 93 (holding that a non-compete agreement was validly assigned when the sale of the business did not affect the employee's duties, hours, or pay). When the Court considers all of these factors together, it concludes that Plaintiffs are unlikely to succeed on the merits of their breach of contract claim because the non-compete clause was not assignable.

Finally, it bears noting that, although Plaintiffs showed that Thomas gave contact information for National City employees to Prime recruiters, they did not provide any evidence that Thomas solicited a single National City customer. For all of these reasons, Plaintiffs are unlikely to succeed on the merits of this claim.

### 2. Trade Secret Misappropriation

Plaintiffs demonstrated that they are likely to succeed on the merits of their trade secrets claim in part, but not entirely. To the extent that this claim is based on Plaintiffs' allegation that Defendants misappropriated their customer list, the claim is unlikely to succeed. That list was not a trade secret because it was readily ascertainable by proper means. *See Boeing v. Sierracin Corp.*, 108 Wn.2d 38, 49–50 (1987). Customer names, addresses, loan dates, and loan values are available from a title search for only $12.00. (Ct. Rec. 99 at 8.) State law encourages mortgage lenders to file this information in order to protect their security interests. RCW 65.08.070. Thus, Defendants had access to

Plaintiffs' entire customer list for a modest fee, and it was public information. Plaintiffs claim that it would have been very expensive and time-consuming to compile all the customer information that Defendants took from them. That might be, but publicly available information does not become a trade secret even if it is expensive to acquire. *Sierracin Corp.*, 108 Wn.2d at 49–50.

Further, Defendants persuasively argue that any non-public information that may have been included with the customer lists that the departing employees allegedly took with them, such as social security numbers and birth dates, is useful in completing a loan application but not in soliciting customers, because it is used only after the customer has decided to borrow from the mortgage lender. (Ct. Rec. 93 at 6; Ct. Rec. 96 at 2.) Plaintiffs point to no evidence that any former National City employee ever disclosed or used such information for Prime's benefit. They merely surmise that former employees probably did so. In fact, the only evidence presented is to the contrary: Prime Regional Senior Vice President Kale Salmans specifically told all National City employees who were coming to work for Prime *not* to take or use any information that is not publicly available. (Ct. Rec. 97 at 6; *id.* Ex. A.) Therefore, Plaintiffs are unlikely to succeed on this claim insofar as it relies on Defendants misappropriating customer information.

On the other hand, Prime admits that it received some confidential information about Plaintiffs' business from National City employees. Prime asked all National City employees to send pipeline reports, or reports that showed their recent loan activity, to Prime. Those reports contained confidential information that qualified as a trade secret, such

1  as the employee's compensation and whether the employee had loans

2  scheduled to be completed. (Ct. Rec. 115 Ex. 8 at 84–86.) Also, Thomas

3  sent a pro forma containing confidential information about the Spokane

4  branch's operations that was used to evaluate the branch before Prime

5  acquired it. *Id.* at 91. Prime maintains that information was used not to

6  solicit customers but to evaluate the business. *Id.* at 86, 91.

7  Nevertheless, Prime used improper means to acquire the information: it

8  induced National City's outgoing employees to breach their agreements to

9  maintain confidentiality. Any misappropriation of trade secrets, even if

10  it is not used to harm their rightful owner, is actionable. RCW

11  19.108.010; 19.108.020; 19.108.030. Whether Defendants are misusing those

12  trade secrets to poach former National City customers affects whether

13  Plaintiffs continue to suffer irreparable harm, but a violation occurred

14  when Defendants received the information regardless of the continuing

15  harm. Ongoing harm from that misappropriation is a separate question

16  addressed below.

17    **3.  Breach of Duty of Confidence and Loyalty**

18    Plaintiffs argue that Thomas breached his duty of confidence by

19  disclosing proprietary customer information to Prime and breached his

20  duty of loyalty by performing several tasks on Prime's behalf while still

21  employed by National City. Defendants are correct that the cause of

22  action for breach of the duty of confidence is precluded by the UTSA

23  because it is factually indistinguishable from trade secret

24  misappropriation. *See* RCW 19.108.900; *Thola v. Henschell*, 140 Wn. App.

25  70, 78 (2007). On the other hand, it is abundantly clear that Thomas

26  breached his duty of loyalty by acting as a Prime employee while he still

worked for PNC. Even as PNC continued to pay him, Thomas tried to arrange for Prime to move into PNC's office space and had Prime's telephone and data lines installed in PNC's office. He also sent inquiries from prospective customers to his personal e-mail address so as to be able to follow up with them once at Prime. He told Prime that an outgoing PNC employee was frustrated with her inability to upload loans to Prime. Prime even asked him to resolve some personnel problems, though it is unclear that he did so. Working for a competitor while still employed by PNC clearly violated Thomas's duty of loyalty. *See Organon, Inc. v. Hepler*, 23 Wn. App. 432, 436–37 (1979).

### 4.  Tortious Interference with Contract

Plaintiffs argue that Prime tortiously interfered with National City's customer relationships, the employment agreements with Thomas and all other employees who left to join Prime, and the duties of loyalty owed by those former employees. The elements of tortious interference are 1) a valid contractual relationship; 2) defendants' knowledge about the relationship; 3) defendants' intentionally interference, causing a breach of the relationship; 4) interference was for an improper purpose or used improper means; and 5) damages. *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157 (1997) (citations omitted).

The tortious interference claim is unlikely to succeed. Although it is not preempted by the UTSA because it relies on different facts, the evidence does not bear out Plaintiffs' claims. Plaintiffs surmise that Prime and Thomas encouraged former employees to leave PNC for Prime and solicited customers with whom they had valid contracts. The only direct evidence supporting this assertion is that Thomas gave Kale Salmans other

employees' contact and salary information.[4] But those employees were all free to leave PNC. Merely because Thomas gave Prime publicly available information does not mean he tortiously interfered with the employment contracts. Moreover, contact between Prime and PNC employees was initiated by Greg Templeton, not Thomas or Prime. Indeed, Thomas and other former PNC employees deny that Thomas recruited anybody. (Ct. Rec. 93 at 19; Ct. Rec. 98 at 3-4; Ct. Rec. 99 at 7.) Prime, aided by Thomas's information, recruited some employees (Ct. Rec. 53 Ex. 3), but those employees were upset about the compensation changes and were ready to leave. Prime's recruitment only encouraged them to come to Prime instead of some other lender, not to breach their employment contracts. Nor did Plaintiffs show that Prime encouraged PNC employees to violate their duty of loyalty to PNC, except by saying that Prime asked Thomas to do some work for Prime while he was still employed at National City.

To the extent that the tortious interference claim depends on Prime's solicitation of former National City customers, there is no evidence that Prime did so. As indicated above, Plaintiffs did not identify a single former National City customer who now has a loan with Prime.

_____

[4] Prime's Rule 30(b)(6) designee, Keith Klein, said he believed Thomas probably actively recruited his subordinates to leave for Prime with him. (Ct. Rec. 130 Ex. 2 at 212.) Although this answer binds Prime, it does not bind Thomas, who denied that he did so. Furthermore, Plaintiffs provided no evidence that Prime asked Thomas to recruit PNC employees.

ORDER ~ 16

Plaintiffs' claim that Prime tortiously interfered with Thomas's non-compete agreements is similarly flawed. The non-compete agreements were invalid because they were not assignable to PNC for the reasons detailed above. Prime could not have tortiously interfered with a contract that no longer existed. Accordingly, Plaintiffs are unlikely to succeed on the merits of their tortious interference claim.

### 5.    Unfair Competition

Plaintiffs presumably base their unfair competition claim on Defendants' misappropriation of trade secrets. Like the claim for breach of the duty of confidentiality it is precluded because it is factually indistinguishable from the trade secrets claim.

### 6.    Civil Conspiracy

Plaintiffs' claim for civil conspiracy is unlikely to succeed. To establish civil conspiracy, a plaintiff must prove by clear and convincing evidence that 1) two or more persons combined to accomplish an unlawful purpose or combined to accomplish a lawful purpose by unlawful means and 2) the conspirators entered into an agreement to accomplish the object of the conspiracy. *Wilson v. State*, 84 Wn. App. 332, 350-51 (1996) (citations omitted). Mere suspicion or commonality of interests is insufficient to prove a conspiracy. *Id.* at 351. Plaintiffs point to no evidence that there was an agreement between Defendants to do anything unlawful. All of the departing employees had at-will employment agreements, and Plaintiffs' CEO indicated they were free to leave if they did not like the new compensation scheme. (Ct. Rec. 93 at 14.) Plaintiffs' Rule 30(b)(6) designee also admitted as much. (Ct. Rec. 95 Ex. A at 27.) All the available evidence indicates that, although

1  Prime recruited the employees, they made their decision to leave
2  independently of one another. (Ct. Rec. 98 at 3-4; Ct. Rec. 99 at 7.)
3  Plaintiffs did not show that Defendants or the former National City
4  employees jointly agreed to disclose or misuse confidential information.
5  The current record does not show a likelihood of success on the
6  conspiracy claim.

7  **B.  Likelihood of Irreparable Harm**

8  The Court holds that Plaintiffs are unlikely to suffer any
9  irreparable harm if the injunction does not issue. All harm occurred a
10 year ago, in July and August 2009. Plaintiffs admit they have no plans
11 to open an office in Spokane. PNC's Spokane branch is gone and is not
12 returning soon. Although Plaintiffs suffered harm when they lost their
13 branch, the damages from that loss already occurred and can be
14 calculated. Enjoining Thomas from recruiting employees in Eastern
15 Washington and Idaho serves no purpose because no PNC employees remain
16 for recruitment. Though Plaintiffs showed that Defendants misappropriated
17 trade secrets by taking the mortgage pipelines and pro forma for the
18 Spokane branch, there is no ongoing harm from that misappropriation.
19 Those documents were used to evaluate potential employees, all of whom
20 left PNC, and to assess the Spokane branch, which PNC abandoned for the
21 time being.

22 Plaintiffs complain that all the employees in their Oak Harbor,
23 Washington branch recently left for PNC. But Plaintiffs did not present
24 any evidence that Thomas or any other former National City employee bore
25 responsibility for that defection. Nor did Plaintiffs suggest those
26 employees left for any reason other than their perceived better

opportunities with Prime. Plaintiffs also failed to present any evidence that Thomas is actively soliciting other PNC branches' employees to switch to Prime.

Nor do Plaintiffs suffer ongoing harm because Defendants serve former National City customers. Plaintiffs no longer have a presence in Spokane, so they suffer no harm if their former Spokane customers do business with Prime. Plaintiffs are unable to serve those customers except through their online loan origination service. Even if the online presence is substantial, Plaintiffs did not show that Prime or any former National City employee is actually serving any of their former customers, much less that Defendants misused confidential information to solicit those customers.

## C.    Balance of the Equities

When a court balances the equities, it compares the harm to the moving party if the injunction is not issued to the harm the non-moving party would suffer from a wrongfully-issued injunction. *See Stormans, Inc. v. Selecky*, 571 F.3d 960, 987–88 (9th Cir. 2009) (citing *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)). The equities are at best neutral, if they do not favor Defendants. Plaintiffs did not show that they would continue to suffer any additional harm in the absence of an injunction. Until very recently, they continued to lose branches to Prime, but Plaintiffs did not show that those losses were a result of Defendants' unlawful conduct. Nor did Plaintiffs show that Defendants continue to take away former customers through wrongful use of National City trade secrets, or indeed that Prime now serves *any* former National City customer. All damage is done. In

contrast, a wrongfully-issued injunction would greatly burden Defendants, particularly Thomas. Thomas would be unable to assist in preparing any mortgage loan for a former National City customer for one full year. Effectively, this may prevent him from engaging in his line of work in the Spokane for one year.

**D.   Public Interest**

Because the public has an interest in unrestrained access to a competitive mortgage lending market, this factor disfavors an injunction.

### IV. Conclusion

Plaintiffs did not meet their burden of showing entitlement to the extraordinary relief they seek. Therefore, **IT IS HEREBY ORDERED**:

1) Plaintiffs' Motion for Preliminary Injunction **(Ct. Rec. 50)** is **DENIED**.

2) Plaintiffs' Motion in Limine **(Ct. Rec. 120)** Is **GRANTED IN PART**.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and to provide copies to counsel.

**DATED** this_____20th_____ day of July 2010.


                              S/ Edward F. Shea
_____
                         EDWARD F. SHEA
                    United States District Judge

Q:\Secty\CIVIL\2010\10cv34pi.wpd

ORDER ~ 20